May it please the Court, my name is Shannon Floyd. I'm a student attorney along with co-counsel Kathleen Hammers and supervising attorney David Bronson. We represent the petitioner Mr. Nijem. We would like to reserve two minutes for Kathleen Hammers on rebuttal. Mr. Nijem respectfully asks this Court to remand this case back to the District Court so that the District Court can apply the correct legal standards and review this case under the correct standard of review. The District Court committed two legal errors which weren't remanded. First, they applied the incorrect legal standard for acquiescence, a legal standard which has been expressly overruled by this Court. Second, they erroneously adopted the BIA's conclusion that an honor killing is equivalent to a lawfully sanctioned death penalty and therefore an exception under the United States Reservations to the Convention Against Torture. Counsel, honor killings are ordinarily families, most commonly I suppose it's a father who kills a daughter because she acted in a way consistent with having sex outside marriage. I don't think they use the term honor killings and there's nothing in the record indicating they use the term honor killings for inter-religious killings. An honor killing is any killing in which the family is protecting, a family member is protecting his family's honor. It's a killing committed underneath the Sharia and while the record does actually reflect more women being killed, that's because the number of Christians and apostates in general in Jordan are so few. There's only between four to six percent Christians in Jordan and then they actually limit them, their ability to convert Muslims. So the number of apostates is even smaller. The U.S. country report also says that the number of honor killings, most of them do not go reported. So statistically we don't know. Is there anything in the record to indicate that these, that inter-religious killings are even called honor killings? An honor killing describes any crime committed underneath the Sharia and that is in the country report. So the country report does say that under the Sharia an apostate is the death, gets the death penalty, is to receive the death penalty. May I ask a question? I didn't see any evidence in the record that he would be tortured. He would be. I hear the I.J. said that and the BIA, I believe this is the case, said the I.J. conflates death and torture. Let's assume he'd be killed. How does that get him under C.A.T.? He would be subject to torture because the regulations define torture as an act that is intended to cause. I can't hear you. The regulations define torture as an act that is intended to inflict severe physical or mental torture on an individual. Sure. Pain and suffering. Honor killings are committed in the most brutal fashion. If we look at the way these honor killings are committed against women. Okay. What part of the evidence here shows that he would be killed in a brutal fashion? Please. We have to correlate this as the immigration judge did and find that he is similar situated to these women who are subject to honor killings. They have been axed to death. They have been run over by cars. They've been shot multiple times in the head. And that's in the record at what exit? At what page? It's in our brief that I know of for sure, but it is also. Your brief is interesting, but I'm asking you, where is that evidence in the record? About how these women have been killed? What the summary executions are about. A, how they've been killed, and B, how people who are subjected to killing because of their religion are killed. That is what the immigration judge found. I hear what he found. I'm asking you where the evidence is. I understand what he found. The immigration judge said he will be tortured and killed. The BIA said, the immigration judge on this record, said the BIA, is conflating two concepts. There's no evidence he'd be tortured. He just might be killed, but we don't see that he'd be tortured. That's my question to you. Where is the evidence he would be tortured? Okay. There is no evidence on apostates as far as whether or not how they would be killed. The evidence on the record shows that they would be subject to honor killings because, as Sharia says, mandates a crime of death for apostates. But the regulations deposition of torture also includes a threat of imminent death. If my client is sent back to Jordan, he will go back there knowing he is subject to an honor killing as soon as his apostasy is discovered. I think he testified he'd be killed. If that's accurate, if what you say is accurate, then in our country, we are constantly torturing people. Some people would say so. And everybody on death row in our country is subject to escaping and getting to another country where they will have to withhold it because we're going to torture them. I take it that's your argument. Any time you can project that somebody is going to kill you, then that's torture. Is that true? No, Your Honor. In our country What is true, then? The people who are on death row in our country, they're subject to lawfully sanctioned death penalties consistent with our Constitution. Honor killings are not carried out by the Jordanian government. They're carried out by Jordanian citizens with the acquiescence of the Jordanian government. That's the distinction. There's no other. The question isn't we're talking about torturing. And if our country, consistent with its Constitution, tortured people, I suppose those people would be able to get protection under this convention if they went to another country. But you're saying the mere fact that somebody perceived he's going to be killed is torture. And that's my question to you. Where does that come from? If that's your position, I understand your position. That is your position, I take it. Yes, Your Honor. So people are being tortured in this country because they can perceive they will be killed. No, Your Honor. Because they're going to be killed under a lawfully sanctioned death penalty. So if the government in this case lawfully said anybody who's an apostate will be executed, then that would be torture? No? No, Your Honor. In Jordan? No. Under the Convention Against Torture, you have to have both acquiescence and torture. I said the government of Jordan says that if you switch religions, you're an apostate, and that's grounds for the death penalty, period. You will be executed. And you would say that's torture, correct? Isn't your point that there are summary killings and summary killings? That reports show that where you have Sharia law or religious law, the killings are often as a result of extensive torture before the killing. Whereas in this country, an execution by lethal injection and so forth is not, that is not permitted in this country. Is that your argument? That's the exact purpose of the U.S. reservation to the Convention Against Torture. All right. Do you have any case law in which this Court has granted cat relief, Convention Against Torture relief, when a petitioner faces that type of execution in another country where we have no direct evidence in this record of the extent of pain and suffering that that type of execution in that country is likely to entail? Was there anything in the country reports that you submitted that indicated that when you have religious killings, they are accompanied by extreme torture? The only evidence we have is what is in our brief. And this Court is able to say that. Well, the brief is not evidence. Right. But it's cited to in our brief, which was not before. What did she cite to you in your brief? We cited to different articles and stuff that we had pulled up that described these honor killings and the manner in which that they have been. And you submitted those. They're in the record then? They are in our brief. Okay. So you do have something. They're in the record? They were placed before the district court, or you're putting them, giving them to us? It was in our brief submitted to you. We were not involved in the district court. Well, then they're not part of the record on appeal, are they? This Court is able to take judicial notice of that, of what our brief says. You believe, then, that anything in your brief we can take judicial notice of. Is that true? Of the record as submitted, yes, Your Honor. The report cited to you in your brief, is that what you're saying? Right. It is cited to us. You're asking us to take judicial notice of published reports of horrific killings in cases of religious discrimination. Correct, Your Honor. I don't remember your citing to any horrific killings in cases of apostasy, just horrific killings in the cases of unmarried women suspected of having sex or women suspected of having extramarital sex. That is what our brief cites to. It cites to honor killings in general, how they're carried out, and then we use a correlation that the immigration judge has found that ours. Because I remember you say, number one, there are honor killings there of women in these circumstances. Number two, under the Muslim law, religious law, which is not the law of Jordan, apostates are subject to a death penalty if they convert away from Islam. Number three, honor killings may be imposed where people violate religious law. Therefore, number four, this fellow could expect to be killed like those women. That's it, isn't it? Right. His circumstances are such that he would, in fact, be subject to an honor killer for returning to Jordan. Let me ask you one more thing before you sit down on a different topic. The red brief doesn't raise it in this way, so it may be that it's not in the case. I don't know. Why isn't there a failure to exhaust because he did not perfect his appeal or his petition for review before this Court? I'm sorry. I don't understand. As I recall, he lost on his asylum claim. He petitioned for review and asked for informed apocryphal status. We denied him informed apocryphal status and said he could proceed with his appeal if he paid the filing fee. He did not pay the filing fee, so his appeal was dismissed. And as a result, although he had the opportunity at that time to obtain review, he did not take it. I believe, Your Honor, that he lost on his asylum claim, but he was granted a cat relief. And if he had been granted asylum relief, well, he couldn't be granted asylum relief because he was an aggravated felon. So at that point, there was no direct appeal to this Court because of IRA-IRA. He had to go directly to the U.S. Court of Appeals, which is why he did not proceed further in the district court. But, again, I'm speculating because we did not. When he petitioned for review to our court, was the cat issue one that the IJ had granted relief and then the BIA had denied it at that time? I can't remember right now. I believe so, Your Honor. Thank you, Counsel. Good morning. May it please the Court. I'm David Dauenheimer on behalf of the Attorney General. Petitioner may not avoid this Court's prior dismissal of his claims for failure to prosecute by simply adding them to his subsequently filed habeas petition. Dismissal for failure to prosecute is akin to a dismissal on the merits, and Petitioner is thus precluded from re-raising these same issues for deferral of removal under the Convention against Violence. But we didn't have jurisdiction, did we? The Court never reached the issue of whether it had. I know we didn't reach it, but we, as a matter of fact, we didn't have subject matter jurisdiction, did we? It appears because of his aggravated felon status, this Court would indeed be without jurisdiction to have heard his appeal. So if we didn't have any jurisdiction over his case in the first place, how in the world could we raise judicata him when we didn't have any jurisdiction? Under the particular facts of this case, it's because he filed the petition for review. Based on that filing, he was given a delay on stay of removal. He remained in custody, was not removed. He then fails to perfect his appeal. He doesn't pay his filing fee. But he's already accomplished what he wanted, that is, stay his removal. It would be for the Court to then say, the Court has prior precedent which holds that a dismissal for failure to prosecute is a decision on the merits. So in this particular case, the dismissal would act as a decision on the merits and would preclude him re-raising those issues which he could have or should have raised in his first case. So if he does this, and between the time we say, look, you've got to file, you've got to pay money, he says, gosh, if I've got to pay money, I'd better talk to a lawyer. And he talks to a brilliant lawyer. And the lawyer says, they don't even have jurisdiction. If you pay your money, the next thing they're going to do is say they don't have jurisdiction. So you'll be out your filing fees, and they won't have jurisdiction, and they'll dismiss your case. So why don't you just let it go? And that's what he does. Well, letting it go wouldn't be the proper course. He could have withdrawn his appeal before this Court. He probably should have done that, yes. And he probably should have done that after all. Are you saying that we – that it's res judicata on the question that we did have jurisdiction, because the jurisdiction question wasn't raised, and therefore it's res judicata we did have jurisdiction? Is that your point? I think the argument is that the jurisdictional question was never reached by the Court because he failed to fully prosecute his case. But, look, if we agree that we didn't have jurisdiction, if a court doesn't have jurisdiction and you can raise that in front of me and tell me that, then I don't see how whatever we did has any effect on the merits whatsoever offhand. Maybe you can explain. I understand. And I think if his case was dismissed for failure because this Court didn't have Well, let me backtrack, Your Honor. There are cases where this Court has dismissed because it didn't have jurisdiction, and then it has held that that dismissal still acted to preclude the Petitioner from raising arguments on an ahabeus petition. Oh, sure. If we said we don't have jurisdiction because he's an aggravated felon, you can't then go in on ahabeus and say, you know, he's not really an aggravated felon. They made a mistake finding him to be an aggravated felon. I understand that. Right. Because we had to make that actual determination to make our jurisdictional determination. That makes sense. But here we have a case where that doesn't seem to be the situation. We just plain didn't have jurisdiction. Correct? Well, we never agreed. I mean, you would agree that he was an aggravated felon, I take it. Yes, Your Honor. He was an aggravated felon and we didn't have jurisdiction to hear his appeal. You would agree to that, would you not? I would, Your Honor. Hmm? I do, Your Honor. I agree that he was an aggravated felon. Okay. So what you're saying is it's raised to you, Dakota, that we did have jurisdiction anyway. I'm not saying it's a crazy argument. I'm just making sure what your argument is. Well, yes, Your Honor. I guess what I'm saying is because of the particular facts of this case and his failure to prosecute and the precedent of this Court holding that a failure to prosecute is a decision on the merits, that will operate to preclude him from raising the claims that the very claims that he was going to raise and that he raised in the petition for review again before the habeas court. Counsel, since your time is running out, I'd like to move to another issue. I think the issue of race judicata has been raised at least. How do you reconcile the BIA's analysis with our recent decision in Xiong, Z-H-E-N-G, in which we clearly held that governmental acquiescence can include willful blindness? Now, doesn't this wholly make the BIA's observation is that the Jordanian government has not itself been torturing or killing Christian converts and that there is no national law prescribing death punishments for converts beside the point, if there is acquiescence and it's taking place? And this is to distinguish it from the matter of S.V. Right, Your Honor. Well, I think first the primary point is that the Board's decision wasn't based primarily upon a lack of showing of acquiescence by the Jordanian government. What it was really based on was that Petitioner had failed to show that it was more likely than not that he would be tortured if he was removed to Jordan. The cite to matter of S.V. was secondary to the gravamen of the BIA's holding. The BIA noted that he could, the Petitioner admitted that he could move to Amman and not be subject to the feared killing that he had noted that his family might bring about. When he was asked, he said, quote, I sure could live in the capital. However, it just, it's a matter of financial, finances. When he was asked, if you live in the capital, you could practice your Christianity? He answered, yes. That's in the administrative record at 105. The BIA's position By the way, why didn't we get a copy of the certified administrative record? I thought it was very odd. It was not, either side, neither side submitted it. I think what occurred is it's because of the posture of his case. He filed before this court the petition for review. The certified administrative record was generated for that review. That review he failed to prosecute, and it was dismissed. He then filed a habeas. The burden was then on him before the habeas court to put forth evidence that would compel a conclusion contrary to the decision of the board. He didn't present that evidence. There was evidence that it appears that the briefing in that court was primarily towards the, whether his continued custody would be within the law, and dealt with more issues along the lines of Zad Vidas and whether his continuing detention was appropriate. All right. Well, that's sufficient. And I think that's why the case came in this posture. The district court took what was provided by the We're going to get that, and I gather, I'd ask your adversary about this, too. I gather that once we examine the administrative record, it will be unambiguous that Nijam admitted that he would be safe from this interreligious killing if he lived in Amman. Is that right? That's what it shows. That's correct, Your Honor. I mean, from what I've quoted to you, it's also Do we need to decide anything else if that's unambiguously the fact and that's in the record? No, Your Honor. That alone would be sufficient to support the board's decision that he's not entitled to deferral or no longer. Having read this, having obtained it and read it, I think a lot depends on the context in which that question was asked. You know, he said, I probably could live there, but it was in the context of several other questions. As I read it, and I'll go back and reread it, it did not indicate a direct statement that he would feel safe. Well, the direct statement was the one that I quoted from page 105, where he admitted that he could live in the capital. However, it was just a matter of finances, essentially. Just a matter of? Finances, Your Honor. All right. And then there was a follow-up question where he was asked, if you lived in the capital, you could practice your Christianity. And he answered, quote, unquote, yes. There is some attempt to muddy the waters and show that, well, it's as long as he remained secret from his family that he could do that and that he wasn't sure whether that would be the case or not. However, his answers to the initial questions, I think, provide substantial evidence to support the Board's decision in this matter. It's his burden to prove. It's more likely than not that he'll be tortured, isn't it? That's correct, Your Honor. And with regard to the other evidence. Incidentally, on the honor killings, you heard my confusion on that. Is there any evidence in the record that what are called honor killings and are traditionally not effectively prosecuted in a lot of Arab countries, that they relate to these interreligious things as opposed to just sex? Well, the Department of State report does state that Muslims who convert complain of, quote, social and government discrimination. And it goes on to explain that under Sharia, they are considered apostates. You understand I didn't ask you about either of those things. I asked you about honor killings. Yes, Your Honor. Are you leading up to that? Yes, Your Honor. Okay. It also says that they may be legally denied their property and other rights. But then it says that this principle is not applied. So even those lesser, say, prohibitions aren't even applied. And there's no evidence in the Department of State report that shows that honor killings were applied to males who converted from Christianity. In fact, the evidence seems to suggest the opposite, that they don't even apply these lesser prescriptions against it. I see that my time is up. Thank you, counsel. Thank you. Nijm versus Ashcroft is submitted. Response. Oh, I think they've gone over their time. They went over their time. No, I'm sorry. I thought they had a minute and a half. Rebuttal, of course. All right. I'd like to ask one question. Let's have counsel back up for rebuttal in case the Court has questions. One question that I would like you to answer is about his own testimony, that he felt he could live safely, if you could answer that question. Yes. On the very next page of his testimony, after the page that the government cited to, he explains that while he does not know exactly how long it would take for his family or other citizens to find out about his apostasy, that he would only be safe in Amman until that was found out and that surely that would be found out. Thank you. That answers the question. I think your time is up, but thank you. Thank you. Thank you, counsel. I think the student argument was very good. It was well done. Indeed, it was. We're kind of hard sometimes, and you stood up to us really well. We just treated you like a real lawyer. I have to thank the law professor as well. Thank you, counsel. Avendano-Ramirez v. Ashcroft. Okay, we'll do something else first. Let's see. That's it. That's it. Morelli v. Ashcroft, submitted. Mason v. Hamlet, submitted. Baudoin v. Ashcroft, submitted. Tawilatala v. Ashcroft, submitted. Greer v. Ashcroft, submitted. Kozol v. Ashcroft, submitted. Wilson v. Yarborough, submitted. And we are out of cases to hear. Except for this Morelli. What we could do, I suppose, is start deliberating. And you just let us know when they're free. We'll recess until counsel are available on Morelli. No, I'm not. Did I get the case wrong? Avendano-Ramirez. I'm sorry. The government house wasn't available? It's in another courtroom. Oh, okay. Thank you. Oh, I guess you all didn't hear the clerk. One of the lawyers in Avendano-Ramirez is arguing two cases simultaneously in two different courtrooms. It's very hard to do. So we're just going to wait for that lawyer to finish in the other courtroom, and then we'll come out of deliberations, come back into this courtroom, and hear the case. You probably want to stay around. I'm sure it will just be a matter of minutes. We'll recess until the lawyers in Avendano-Ramirez are ready. Thank you. Thank you. Thank you.
judges: Dw Nelson, Fernandez, Kleinfeld